United States District Court
Southern District of Texas
FILED

NOV   4 2010

David J. Bradley, Clerk of Court

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | CRIMINAL NO.: **10 - 767** |
| | § | |
| v. | § | Violations |
| | § | 18 U.S.C. § 371; |
| SHELL NIGERIA EXPLORATION | § | 15 U.S.C. §§ 78m(b)(2)(A), |
| AND PRODUCTION | § | 78m(b)(5) and 78ff(a) |
| COMPANY LTD. | § | |
| | § | |
| Defendant. | § | |

## INFORMATION

The United States charges:

## GENERAL ALLEGATIONS

At all times material to this Information, unless otherwise stated:

### *The Foreign Corrupt Practices Act*

1.      The Foreign Corrupt Practices Act of 1977 (hereinafter the "FCPA"),

as amended, Title 15, United States Code, Sections 78dd-1 *et seq.*, prohibited

certain classes of persons and entities from corruptly making payments to foreign

government officials to assist in obtaining or retaining business.  Pertinent to the

charges herein, the FCPA prohibited any person other than an issuer or domestic

concern, while in the territory of the United States, from making use of the mails or

any means or instrumentality of interstate commerce, or doing any other act,

1

corruptly in furtherance of an offer, payment, promise to pay, or authorization of the payment of money or anything of value to any person, while knowing that all or a portion of such money or thing of value would be offered, given, or promised, directly or indirectly, to a foreign official for the purpose of obtaining or retaining business for, or directing business to, any person. 15 U.S.C. § 78dd-3(a).

2.      Furthermore, the FCPA required issuers to make and keep books, records, and accounts that accurately and fairly reflect transactions and disposition of the company's assets and prohibited the knowing falsification of an issuer's books, records, or accounts. 15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(5), and 78ff(a). The FCPA's accounting provisions also required that issuers maintain a system of internal accounting controls sufficient to provide reasonable assurances that: (i) transactions are executed in accordance with management's general or specific authorization; (ii) transactions are recorded as necessary to (I) permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) maintain accountability for assets; (iii) access to assets is permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals, and appropriate action is taken with respect to any differences. 15 U.S.C. § 78m(b)(2)(B). The FCPA prohibited the knowing circumvention or failure to implement such a system of

2

*Relevant Shell Group Entities*

3.     Royal Dutch Shell plc ("RDS") was an English company, with headquarters in The Hague, The Netherlands.  RDS's American Depository Receipts were registered with the U.S. Securities and Exchange Commission ("SEC") pursuant to Section 12(b) of the Securities Exchange Act of 1934 and were publicly traded on the New York Stock Exchange.  Accordingly, RDS was an "issuer" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(a).  By virtue of its status as an issuer, RDS was required to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflected the transactions and dispositions of its assets. RDS owned a global group of energy and petrochemicals companies (collectively referred to as the "Shell Group") operating in more than 90 countries, including Nigeria.

4.     Defendant SHELL NIGERIA EXPLORATION AND PRODUCTION COMPANY LTD. ("SNEPCO"), a wholly owned subsidiary of RDS, was a Nigerian company with headquarters in Nigeria.  As more fully described herein, SNEPCO's agents, including employees of its U.S. affiliates, while in the territory of the United States, used and caused the use of the mails and means and instrumentalities of interstate commerce and performed other acts for SNEPCO's benefit in furtherance of the payment of bribes to foreign government officials for

3

the purpose of assisting in obtaining or retaining business for, or directing business to, SNEPCO and others, such that SNEPCO was a "person" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-3(f)(1). The Shell Group, through SNEPCO, among other entities, endeavored to explore and produce oil in the first deepwater project in Nigeria (hereinafter referred to as the "Bonga Project").

5.    Shell International Exploration and Production Inc. ("SIEP"), a wholly owned subsidiary of RDS, was a Delaware corporation with its principal place of business in Houston, Texas.   SIEP provided a variety of project support services to SNEPCO.  SIEP was a "domestic concern" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).  SIEP provided service and support to SNEPCO and the Bonga Project.

### Relevant Shell Group Employees

6.    The Bonga Project Manager, a citizen of the United Kingdom, was the Bonga Project Manager from in or around 2004, to in or around December 2005. The Bonga Project Manager was employed by Shell UK Limited, but paid by SNEPCO. The Bonga Project Manager was located in Nigeria.

7.    The Subsea Contract Manager, a citizen of the United States, was a SIEP employee. The Subsea Contract Manager provided service and support to SNEPCO and the Bonga Project, and in conducting these activities the Subsea

Contract Manager was an agent of SNEPCO. The Subsea Contract Manager was located in Houston, Texas. The Subsea Contract Manager was a "domestic concern" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-2.

8.   The Subsea Contract Engineer was a SIEP contract employee. The Subsea Contract Engineer provided service and support to SNEPCO and the Bonga Project, and in conducting these activities the Subsea Contract Engineer was an agent of SNEPCO. The Subsea Contract Engineer was located in Houston, Texas.

9.   The Bonga Logistics Coordinator was a contract employee of SNEPCO who provided logistical, customs, and freight forwarding support services to the Bonga Project. The Bonga Logistics Coordinator was located in Nigeria.

### SNEPCO Subcontractors and Agents

10.   The Subsea EPIC Contractor, a United Kingdom corporation, and its subsidiaries were SNEPCO's engineering, procurement, installation and commissioning ("EPIC") contractor for subsea services. The Subsea EPIC Contractor supplied SNEPCO with subsea equipment and associated hardware and software to facilitate oil production, including manifolds, trees, wellheads, connection systems, controls, modules, intervention equipment, integration testing, and installation support. The Subsea EPIC Contractor was a "person" within the

meaning of the FCPA, Title 15, United States Code, Section 78dd-3(f)(1).

11. The Topsides EPIC Contractor, a United Kingdom corporation, and its subsidiaries provided project management, engineering design, and fabrication services to produce a Floating Production, Storage, and Offloading (FPSO) vessel and provided an array of other engineering services to install topside oil and gas processing equipment to facilitate oil exploration.

12. The Freight Forwarding Agent, a Swiss company, and its subsidiaries was a large, global provider of freight forwarding and logistics services, specializing in intercontinental air and ocean freight shipping and associated supply chain management solutions, including express door-to-door courier freight forwarding. The Freight Forwarding Agent was hired by both the Subsea EPIC Contractor and the Topsides EPIC Contractor to provide logistics and immigration services. The Freight Forwarding Agent was a "person" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-3(f)(1).

### *Nigerian Government Officials*

13. The Nigerian Customs Service (NCS) was a Nigerian government agency within the Ministry of Finance of the Federal Republic of Nigeria. The NCS was responsible for assessing and collecting duties and tariffs on goods imported into Nigeria. The NCS was an agency and instrumentality of the Government of Nigeria and its employees were "foreign officials" within the

meaning of the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

### *The Bonga Project*

14.    Bonga was the first deepwater oil and gas field project in Nigeria. The Bonga field was located approximately 120 kilometers off the coast of the Niger Delta.  From in or around 1999 to in or around 2005, the development of the Bonga field was in the planning and construction phase and was referred to as the Bonga Project.

15.    SNEPCO oversaw the project execution, but the Bonga Project was staffed and supported by personnel from other RDS subsidiaries, including SIEP, based in Houston, Texas.

16.    During the development and construction of the Bonga Project, SNEPCO entered into four primary EPIC contracts with separate subcontractors, including for: (a) subsea systems and umbilicals, and (b) topsides systems.

17.    The Subsea EPIC Contractor was awarded the subsea systems and umbilicals contract and the Topsides EPIC Contractor was awarded the topsides contract.

18.    To complete the construction, the Subsea EPIC Contractor and the Topsides EPIC Contractor needed to transport and import numerous items, including tools and materials, into Nigeria.  Both EPIC contracts required the contractors to hire an agent to coordinate all customs clearance activities.  Both the

Subsea EPIC Contractor and the Topsides EPIC Contractor employed Freight Forwarding Agent to act as their freight forwarding and customs clearance agent.

19.    One of the services provided by the Freight Forwarding Agent was an express door-to-door courier service called "Pancourier" that expedited the delivery of goods and equipment into Nigeria. The Pancourier service involved the payment of bribes by the Freight Forwarding Agent to NCS officials to expedite the delivery of materials by inducing the officials to circumvent the official Nigerian customs clearance process and to provide an improper advantage with respect to the importation of certain tools and materials that were imported into Nigeria. As a result of the payment of the bribes, SNEPCO employees knew that official Nigerian duties, taxes, and penalties would not paid when the items were imported.

20.    The Freight Forwarding Agent invoiced the Subsea EPIC Contractor and the Topsides EPIC Contractor for the bribes that it paid to the NCS officials and characterized the payments as, among other things, "local processing fees" or "administration/transport charges."

21.    The Subsea EPIC Contractor and the Topsides EPIC Contractor, in turn, sought reimbursement from SNEPCO for these charges.

22.    By in or around March 2004, SNEPCO and SIEP employees, including the Bonga Logistics Coordinator, knew, or were substantially certain,

that all or a portion of the money paid by the Subsea EPIC Contractor and the Topsides EPIC Contractor to the Freight Forwarding Agent for the Pancourier service was being paid as bribes to NCS officials to secure an improper advantage with respect to the importation of certain tools and materials that were imported into Nigeria. SNEPCO and SIEP employees were aware that as a result of the payment of the bribes, official Nigerian duties, taxes, and penalties were not paid when the items were imported.

23.   Between in or around March 2004, and in or around November 2006, certain other SNEPCO employees repeatedly authorized the Subsea EPIC Contractor and the Topsides EPIC Contractor to use the Pancourier service. This resulted in the payment of over $2 million to reimburse the subcontractors for charges submitted by the Freight Forwarding Agent. SNEPCO intended that some or all of this money was to reimburse the subcontractors for the bribes made to NCS officials. The benefit to SNEPCO resulting from the bribes exceeded $7 million.

24.   Throughout the relevant time period, SNEPCO recorded the reimbursements for the improper payments to the NCS officials in its books, records, and accounts as "local processing fees" and "administration/transport charges," among other terms.

25.   At the end of SNEPCO's fiscal years 2004 through 2006, the books,

records and accounts of SNEPCO containing the false characterizations of the payments to the NCS officials, were incorporated into the books, records and accounts of RDS for purposes of preparing RDS's consolidated year-end financial statements filed with the SEC.

## COUNT 1
### Conspiracy to Violate the Foreign Corrupt Practices Act
### (18.S.C. § 371)

26.     Paragraphs 1 through 25 of this Information are re-alleged and incorporated by reference as though fully set forth herein.

27.     From at least in or around February 2004, to in or around November 2005, in the Southern District of Texas, and elsewhere, the defendant, SHELL NIGERIA EXPLORATION AND PRODUCTION COMPANY LTD. ("SNEPCO"), being a "person" under the FCPA, did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate and agree with, the Bonga Project Manager, the Subsea Contract Manager, the Subsea Contract Engineer, the Bonga Logistics Coordinator, the Subsea EPIC Contractor, the Topsides EPIC Contractor, the Freight Forwarding Agent, and others, known and unknown, to commit offenses against the United States, that is:

        a.     while in the territory of the United States, to willfully make use of the mails and means and instrumentalities of interstate commerce and to do

10

other acts corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to any foreign officials, and any person while knowing that all or a portion of such money or thing of value would be or had been offered, given, or promised, directly or indirectly, to foreign officials, for the purpose of:  (i) influencing acts and decisions of such foreign officials in their official capacities; (ii) inducing such foreign officials to do and omit to do acts in violation of the lawful duties of such officials; (iii) securing an improper advantage; and (iv) inducing such foreign officials to use their influence with a foreign government and instrumentalities thereof to affect and influence acts and decisions of such government and instrumentalities, in order to assist SNEPCO and others in obtaining and retaining business for and with, and directing business to, SNEPCO and others, in violation of Title 15, United States Code, Section 78dd-3(a); and

        b.    to knowingly falsify and cause to be falsified books, records, and accounts which, in reasonable detail, would accurately and fairly reflect the transactions and disposition of the assets of RDS, an issuer within the meaning of the FCPA, in violation of Title 15, United States Code, Sections 78m(b)(2)(A), 78m(b)(5) and 78ff(a).

## PURPOSES OF THE CONSPIRACY

28.     The primary purposes of the conspiracy were: (a) to pay bribes to NCS officials in order to secure favorable customs and immigration treatment for items shipped into Nigeria, and (b) to falsify books, records, and accounts of RDS and SNEPCO in connection with the corrupt payments, in order to make the payments appear as legitimate business expenses when, in fact, they were reimbursements for bribes paid to Nigerian government officials.

## MANNER AND MEANS OF THE CONSPIRACY

29.     To accomplish the purposes and objects of the conspiracy SNEPCO and its co-conspirators used the following manner and means, including:

a.     It was part of the conspiracy that SNEPCO and its co-conspirators authorized the Subsea EPIC Contractor and the Topsides EPIC Contractor to employ the Freight Forwarding Agent to provide express courier services, knowing that the service involved payments to NCS officials to expedite the delivery of materials by inducing the officials to circumvent the Nigerian customs clearance process and which resulted in the non-payment of official Nigerian duties, taxes, and penalties.

b.     It was further part of the conspiracy that the Bonga Logistics Coordinator and others falsely characterized the reimbursement for payments to the NCS officials in SNEPCO's books, records, and accounts as "local processing

12

fees" and "administration/transport charges," among other terms, when, in truth and in fact, some or all of these payments were bribes paid through the Freight Forwarding Agent to NCS officials.

c.   It was further part of the conspiracy that at the end of SNEPCOS's fiscal years 2004 and 2005, the books, records and accounts of RDS' wholly owned subsidiaries, including those of SNEPCO containing the false characterizations of the bribes paid to NCS officials, were incorporated into the books, records and accounts of RDS for purposes of preparing RDS' consolidated year-end financial statements which were filed with the SEC.

## OVERT ACTS

30.   In furtherance of the conspiracy and to achieve its purposes and objects, at least one of the co-conspirators committed or caused to be committed, in the Southern District of Texas, and elsewhere, the following overt acts, among others:

a.   On or about February 27, 2004, a Subsea EPIC Contractor employee sent a letter to SNEPCO advising SNEPCO that the Freight Forwarding Agent's "local processing fees" were charges for material shipped to Nigeria that were "not inspected by customs."

b.   On or about June 2, 2004, the Subsea Contract Manager, located in Houston, Texas, sent an email to SNEPCO employees in Nigeria

authorizing the Subsea EPIC Contractor to use Pancourier to transport electrical equipment, with knowledge of facts indicating that a bribe would be paid through the Freight Forwarding Agent to the NCS officials to expedite the delivery of materials by inducing the officials to circumvent the Nigerian customs clearance process and which resulted in the non-payment of official Nigerian duties, taxes, and penalties.

c.    On or about June 4, 2004, the Subsea Contract Engineer, located in Houston, Texas, sent an email to SNEPCO employees in Nigeria authorizing the Subsea EPIC Contractor to use Pancourier to transport miscellaneous parts with knowledge of facts indicating that a bribe would be paid through the Freight Forwarding Agent to the NCS officials to expedite the delivery of materials by inducing the officials to circumvent the Nigerian customs clearance process and which resulted in the non-payment of official Nigerian duties, taxes, and penalties.

d.    On or about August 25, 2004, the Bonga Logistics Coordinator met with the Subsea EPIC Contractor and Freight Forwarding Agent employees in Nigeria and told them that if the Freight Forwarding Agent resubmitted the Pancourier invoices and replaced the terms used on the Freight Forwarding Agent invoices that identified the improper payments to the NCS officials from "local processing fee" to "administration/transport charge," SNEPCO would reimburse

the Subsea EPIC Contractor for the charges.

e.  On or after March 30, 2005, a Subsea EPIC Contractor employee drafted and sent an email from Nigeria to the Bonga Project Manager, located in Nigeria, and the Subsea Contract Manager and the Subsea Contract Engineer, in Houston, Texas, advising that Pancourier was "illegal."

All in violation of Title 18, United States Code, Section 371.

## COUNT 2
### Aiding and Abetting False Books and Records Violation
### (15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(5) and 78ff(a), and 18 U.S.C. § 2)

31.  Paragraphs 1 through 25 and 29 through 30 above are re-alleged and incorporated by reference as though fully set forth herein.

32.  From in or around March 2004, through in or around 2006, in the Southern District of Texas, and elsewhere, the defendant, SNEPCO, did knowingly and willfully aid, abet, and assist and cause the commission of an offense against the United States, that is, the knowing falsification of books, records, and accounts required to, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of RDS, *to wit*: defendant SNEPCO caused RDS to inaccurately reflect in its books and records payments for freight forwarding costs as "administration/transport charges," when, in truth and in fact, SNEPCO knew that these payments were bribes, paid through the Freight Forwarding Agent, intended to be transferred to NCS officials.

All in violation of Title 15, United States Code, Sections 78m(b)(2)(A),

78m(b)(5) and 78ff(a), and Title 18, United States Code, Section 2.

DATED: November 4 , 2010       JOSÉ ANGEL MORENO
                                  United States Attorney

                                  DENIS J. McINERNEY
                                  Chief, Fraud Section, Criminal Division

By: _Stacey K._____
                                  Stacey K. Luck
                                  Senior Trial Attorney

                                  Fraud Section
                                  Criminal Division
                                  U.S. Department of Justice
                                  1400 New York Avenue, N.W.
                                  Washington, D.C. 20005
                                  (202) 514-5650